IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

> Plaintiff,

vs.                                                    No. 10-CR-2473 MV

PEDRO PEREZ-PARTIDA,

> Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant's Motion to Suppress Evidence Obtained as a Result of Violations of the Fourth Amendment [Doc. 17].  The Court conducted a hearing on the Motion on February 3, 2011.  After considering the Motion, the Government's Response [Doc. 20], Defendant's Reply [Doc. 24], the relevant law, the evidence and arguments presented at the hearing, and being otherwise fully advised of the premises, the Court finds the Motion should be **GRANTED** for the reasons stated herein.

## BACKGROUND

**I.      Defendant's Arrest and the Subsequent Discovery of his Identity**

The relevant facts of this case are not in dispute.  On May 26, 2010, the Albuquerque police department received an anonymous tip regarding possible drug activity at the intersection of San Mateo Boulevard Northeast and Palo Duro Avenue Northeast.  The caller told police that someone in a gold Chevrolet Cavalier was "meeting with" drivers in other vehicles.  Doc. 20 at 2.  Albuquerque Police Detective Dennis Tafoya and another detective established surveillance in the location described by the tipster.  They observed a gold Chevrolet Cavalier parked behind another car.  A man got out of the front car and entered the gold Cavalier, and then quickly left

and returned to his car.

Shortly thereafter, both cars left the area.  Detective Tafoya followed the Cavalier for three miles, after which he requested that another officer, Detective Rogers, assist him in making a traffic stop.  The officers stopped the vehicle and the driver, later identified as Defendant, gave them a Mexican drivers license.  Detective Tafoya spoke to Defendant in broken Spanish.  The parties have stipulated that the defense's transcription of this exchange, as well as its translation into English, are accurate.  The relevant parts of this exchange are as follows:[1]

| | |
|---|---|
| Officer: | Ok.  Like I'm saying, I've been wat . . . I'm uh watching you for one day.  You drive all here in Albuquerque ok . . . .  I know that y . . . that there is smack inside car, derstand?  Do you understand? |
| Defendant: | Yes, yes I understand you. |
| Officer: | Ok, uh.  You gives me.  You give me me . . . of your permission for check the car right! . . .  I can't hear you.  Yes or no? . . .  You do give me permission right! |
| Defendant: | Yes. |
| Officer: | Ok, uh.  You know that that . . . if you don't . . . I have a dog.  Imma come in a little while.  If he comes and he he find it, you go straight to the the jail first and then immigration.  Do you understand?  It's that it's . . . you want that? |

Doc. 17, Attach. B.  After Defendant gave what the officers interpreted as his consent to search the vehicle, they discovered cocaine and heroin in the vehicle, and subsequently arrested Defendant.

The officers transported Defendant to the Albuquerque Prisoner Transport Center.  Pursuant to Mayor Richard Berry's immigrant policy, ICE agents interviewed Defendant, and he admitted that he was illegally present in the United States.  The agents took his fingerprints and discovered his immigration file (hereinafter referred to as Defendant's "A-file"), which named

---

[1] As noted, the transcript demonstrates that Detective Tafoya does not speak Spanish well.  The English translation also contains grammatical errors, which the certified translator states accurately reflect the rudimentary nature of the officer's Spanish.  Doc. 29.

him as Pedro Perez-Nava, aka Pedro Perez-Partida.  The agents discovered that Defendant had

been previously deported following a drug conviction, and they lodged a federal detainer.

Defendant now faces charges for illegally reentering the United States following a conviction for

an aggravated felony, in violation of 8 U.S.C. §§ 1326(a) & (b).

## II.  City of Albuquerque Prisoner Transport Center Policy and Partnership with ICE

Shortly after taking office, Mayor Richard Berry of Albuquerque issued an address at the

dedication of the newly built Albuquerque Prisoner Transport Center ("PTC"), titled "Ending

Sanctuary for Criminals."  Doc. 17, Attach. D.  In his address, he explained the overarching goal

of the PTC: "[T]o expand our capabilities and to create efficiencies by bringing multiple

agencies together in one location with the overall goal of reducing costs and improving public

safety."  *Id*. at 1.  The "multiple agencies" involved include local and state law enforcement

agencies as well as Immigration and Customs Enforcement ("ICE").  *Id*.  Mayor Berry listed the

following primary functions of the PTC: (1) it reduces the transport time of the average

arrestee's trip to jail; (2) it saves arresting officers driving and processing time; (3) it allows

Albuquerque to process multiple prisoners at one time; (4) it allows for the fingerprinting of

"every prisoner that walks through these doors" for purposes of screening for immigration

violations; (5) the facility's added space permits pretrial services to process and screen prisoners,

securing the immediate release of those who meet certain criteria; and (6) the opening of the

PTC has allowed for ICE to work out of the facility.  *Id*. at 1-2.  The mayor clarified that ICE

would be screening every arrestee, regardless of their nationality, race, or the language they

speak.  *Id*. at 3.

After listing these main functions, Mayor Berry concluded: "This agreement with ICE

and its implementation will end Albuquerque's status as a sanctuary for criminals."  *Id*. at 2.

The mayor proceeded to focus heavily on the issue of illegal immigration; indeed, the remainder of his remarks focus solely on this issue, rather than the other functions listed above. *See id*. at 2-5. Mayor Berry framed the opening of the PTC as an important reversal of Albuquerque's previous policy of restricting police officers' ability to check the immigration status of those individuals they arrested. *See id*. at 2. He stated that the policy ensures "that our police officers and the public know that anytime someone is arrested in Albuquerque for a crime their immigration status is **always** pertinent." *Id*. at 3 (emphasis in original). However, he explained: "I have been clear from the start that for me this is not an immigration issue, this is about public safety . . . . Immigrants from any nation are welcome in Albuquerque – criminals are not." *Id*. at 2-3 (emphasis removed). He then described ICE's function at the PTC: whereas ICE's sporadic presence at Albuquerque's Metropolitan Detention Center ("MDC") does not permit it to screen every arrestee, at the PTC ICE efficiently screens every arrestee and further employs "biometric technology . . . to quickly identify people using fictitious names that may be wanted for violent crimes." *Id*. at 5.

## III. Evidentiary Hearing Testimony

At the hearing on February 3, 2011, Detective Tafoya did not testify, nor did any other officer who was present or involved in Defendant's arrest. Albuquerque Police Officer Andrew Dominguez testified regarding the booking procedures at the PTC. His role is to take custody of and fingerprint prisoners after the arresting officer completes a form called a "pre-booker" as well as a criminal complaint. 2/3/11 Tr. at 9. He then copies the prisoner's identifying information from the pre-booker – including the name, date of birth, and place of birth – and inputs this information into the Department of Justice's Automated Fingerprint Identification System ("AFIS"). Officer Dominguez followed this procedure with Defendant following his

4

arrest, and he then fingerprinted Defendant.  The Government introduced Defendant's

fingerprint card, and Officer Dominguez confirmed that he had completed it.  On cross-

examination, Officer Dominguez confirmed that he has nothing to do with the investigation into

the offense of arrest, nor the arrestee's immigration status.  He knows that ICE officers are

federal immigration officers who are present at the PTC for the purpose of interviewing every

arrestee, but he has no knowledge beyond this as to ICE's duties at the PTC.

Following Officer Dominguez's testimony, ICE Agent Nancy Rogers testified as to her

duties at the PTC.  She stated that she goes to jails "to interview everybody that's being arrested

to determine their alienage."  2/3/11 Tr. at 34.  Prior to questioning prisoners, she does not give

them any form of warnings nor does she tell them they are free not to talk to her; however, if

they refuse to talk to her, she concludes the interview.

Agent Rogers explained that after the Albuquerque Police Department books a prisoner,

she interviews the prisoner to determine his or her place of birth.  If the prisoner claims to have

been born in the United States, Agent Rogers proceeds to the next prisoner.  If the prisoner states

he or she was born outside the United States, Agent Rogers asks his or her immigration status.

She then runs the individual through the immigration central index system to determine whether

or not he or she is legally present.  She takes the prisoner's fingerprints electronically, and they

are stored in the Department of Homeland Security's Automated Biometric Identification

System ("IDENT").  Agent Rogers described the IDENT system as "sophisticated" and she

explained that once a prisoner's electronic prints are in the system, it returns information

"immediately," including that person's prior immigration arrests.  *Id*. at 46-48.

If Agent Rogers's investigation indicates that a prisoner is illegally present in the United

States, she further interviews the prisoner and lodges an immigration detainer.  On cross-

examination, she explained that the purpose of this investigation and interview is to determine whether or not the individual has committed an immigration crime.  At no point during this interview does she administer *Miranda* warnings.  Agent Rogers testified that in her twenty-two years as an ICE officer, never has she suspected an arrestee is lying when he or she claims to be a United States citizen.

Following Agent Rogers's testimony, ICE deportation officer James Heinlein testified.  Whereas his knowledge of the policies and procedures at the PTC is "very limited," *id.* at 59, he has substantial knowledge of this particular case because he is the assigned case agent.  Officer Heinlein testified that normally, in an immigration prosecution, ICE utilizes its own fingerprint data from its electronic system, and does not request a fingerprint card from the local agency that arrested the individual.  However, in the instant case, in December of 2010 (roughly seven months after Defendant's arrest and four months following the commencement of the federal criminal prosecution), at the prosecuting attorney's request, Officer Heinlein retrieved the Albuquerque Police Department's fingerprint records of Defendant.

As noted above, the parties did not present the testimony of Defendant's arresting officer, nor any other police officers who might conduct arrests in Albuquerque, as Officer Dominguez works within the PTC.  Agent Rogers testified, based on her own knowledge, that Albuquerque police officers who conduct arrests on the street know that the ICE will interview the arrestee, provided that an officer is present at the PTC when the arrestee is booked.

## DISCUSSION

### I.    Scope of the Court's Inquiry

In his Motion to Suppress, Defendant first argues that the initial stop and search of his car were unlawful.  The Government concedes that "[t]he stop of the Cavalier was not supported by

a reasonable suspicion of criminal activity, and therefore the subsequent warrantless search of the Cavalier violated [Defendant's] Fourth Amendment rights."  Doc. 20 at 4.  The Government further "chooses not to argue that [Defendant's] consent [to search the Cavalier] was so attenuated from the arrest as to cleanse the taint of an unlawful detention."  *Id*. at 6.  For these reasons, the Government agreed to dismissal of all federal drug charges against Defendant.  At the evidentiary hearing, AUSA Norm Cairns stated that the Assistant District Attorney assigned to Defendant's state case agreed that the arrest was "indefensible."  2/3/11 Tr. at 67.

Notwithstanding their agreement regarding the illegality of Detective Tafoya's initial stop, the parties dispute whether or not the Government may introduce evidence of Defendant's identity for the purposes of establishing his guilt under 8 U.S.C. § 1326.  Defendant moves to suppress all evidence of his identity, including his fingerprints and A-file, that staff gathered during Defendant's detention at the PTC.  The Government opposes the Motion.  The issue this case presents is whether or not the identity evidence is sufficiently attenuated from the illegal stop so as to cure the taint of the initial illegality.

## II.     Fourth Amendment Law and "Fruit of the Poisonous Tree" Doctrine

The ordinary remedy in a criminal case for violation of the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct.  *Mapp v. Ohio*, 367 U.S. 643, 648 (1961).  In *Wong Sun v. United States*, 371 U.S. 471, 487 (1963), the Supreme Court held that when evidence is the product of an illegal search, the prosecution may introduce it against the defendant only if it was "come at . . . by means sufficiently distinguishable to be purged of the primary taint."  This rule is widely recognized as the doctrine of "fruit of the poisonous tree."  *See*, *e.g.*, *United States v. Jarvi*, 537 F.3d 1256, 1259 (10th Cir. 2008) (citing *Wong Sun's* "fruit of the poisonous tree" doctrine).  Once a defendant establishes that the search

leading to the evidence in question was unlawful,

> the government [must] prove that the evidence sought to be suppressed is not "fruit of the poisonous tree," either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct.

*United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (citations omitted). Here, the Government argues that the identity evidence it seeks to introduce was sufficiently attenuated from the initial illegality such that it is untainted by Defendant's unlawful arrest. The Government seeks only to introduce Officer Dominguez's fingerprint card, and does not seek to introduce ICE's fingerprint records.

## III.   Exclusionary Rule's Application to Identity Evidence

This case requires the Court to determine the extent to which identity evidence obtained at the PTC pursuant to Mayor Berry's policy may be suppressed under the doctrine of the fruit of the poisonous tree. At the hearing in this matter, AUSA Norm Cairns acknowledged that the Tenth Circuit's case law examining this question does not resolve the instant inquiry. *See* 2/3/11 Tr. of Proceedings at 70 ("[W]e hope to get some clarification from this Court, potentially from the Tenth Circuit, one way or the other . . . . [This] was something of a test case[.]"). The Court has therefore looked beyond Tenth Circuit authority to out-of-circuit case law, as well as a district court opinion from elsewhere in this Circuit, for guidance. Whereas the Tenth Circuit has expressly held that identity evidence may be suppressed as fruit of the poisonous tree, other circuit courts have held precisely the opposite. *See*, *e.g.*, *United States v. Farias-Gonzalez*, 556 F.3d 1181, 1182 (11th Cir. 2009) (holding that "identity-related evidence is not suppressible when offered in a criminal prosecution only to prove who the defendant is"); *United States v. Garcia-Beltran*, 443 F.3d 1126, 1132 (9th Cir. 2006) ("[E]vidence concerning the identity of a

8

defendant, obtained after an illegal police action, is not suppressible as 'fruit of the poisonous tree.'").  The Court will not consider case law from those circuits whose holdings directly conflict with binding Tenth Circuit authority.

A thorough summary of the relevant authority is necessary before the Court may apply this authority – some of which is in slight tension – to the facts of the instant case.  In *United States v. Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006), the Tenth Circuit held that identity-related evidence discovered after an illegal arrest could be suppressed as fruit of the poisonous tree.  There, the defendant was arrested after Border Patrol agents received a tip that undocumented immigrants were living in a trailer park and committing burglaries.  *Id*. at 1106. The agents apprehended the defendant as he was leaving his trailer to drive out of the park.  *Id*. They positioned their car so as to block the defendant from driving out of the driveway, and questioned him about his citizenship.  *Id*.  Prior to receiving *Miranda* warnings, the defendant admitted that he was illegally present in the United States.  *Id*.  Agents arrested him and took him to the Border Patrol station for fingerprinting, where his A-file revealed prior deportations and a criminal record.  *Id*.  In the ensuing illegal reentry prosecution, the district court suppressed all evidence of the defendant's identity, finding that the arrest was illegal and the identity evidence constituted fruit of the poisonous tree.  *Id*. at 1107.

On appeal in *Olivares-Rangel*, the Government conceded that the stop and subsequent arrest were illegal.  *Id*.  However, the Government argued that identity evidence could *never* be suppressed in a criminal proceeding.  *Id*. at 1109.  The Tenth Circuit held that suppression of identity evidence was barred only insofar as the purpose of the suppression was to establish a defense to jurisdiction.  *Id*. at 1109-12 (citing *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032 (1984)). In other words, "the defendant cannot suppress the entire issue of his identity," *id*. at 1111, but

9

evidence of identity may be suppressed in a criminal case, depending on the circumstances, as

fruit of the poisonous tree following an illegal arrest.  *Id*. at 1112.

   The *Olivares-Rangel* court described the proper inquiry for determining whether

suppression of identity evidence is warranted:

> [W]e distinguish between fingerprints that are obtained as a result of an
> unconstitutional governmental investigation and fingerprint evidence that is instead
> obtained merely as part of a routine booking procedure.  In doing so, we hold that
> fingerprints administratively taken in conjunction with an arrest for the purpose of
> simply ascertaining or confirming the identity of the person arrested and routinely
> determining the criminal history and outstanding warrants of the person arrested are
> sufficiently unrelated to the unlawful arrest that they are not suppressible . . . .
>
> [I]n determining whether the fingerprint evidence in this case should be suppressed,
> we must determine the original purpose for arresting and later fingerprinting
> Defendant; that is, was Defendant fingerprinted merely as part of a routine booking
> or processing procedure or was the illegal arrest in part for the purpose of obtaining
> unauthorized fingerprints so Defendant could be connected to additional alleged
> illegal activity.

*Id*. at 1112-16.

   Ultimately, the Tenth Circuit concluded that the evidence before the court was

insufficient for it to determine whether the identity evidence was the product of routine booking

or an illegal arrest whose purpose was to connect the defendant to additional illegal activity.  *Id*.

at 1116.  The court remanded to the district court for an evidentiary hearing, explaining as

follows:

> The precise circumstances under which Defendant was arrested and his fingerprints
> taken are not clear from the record . . . . [T]here is no evidence in the record before
> us to support the Government's assertion that the illegal arrest was not in part for the
> purpose of obtaining Defendant's fingerprints to link him to criminal activity.
> Because, on the record before us, we do not know whether the illegal arrest was
> purposefully exploited for the objective of obtaining Defendant's fingerprints, we
> remand for an evidentiary hearing on this issue.

*Id*.  This Court interprets the Tenth Circuit's language as requiring suppression if Defendant's

10

arrest in the instant case was at least *in part* for the purpose of obtaining his fingerprints to further link him to illegal activity.

In *United States v. Oscar-Torres*, 507 F.3d 224, 230 (4th Cir. 2007), the Fourth Circuit cited *Olivares-Rangel* in support of its conclusion that fingerprint evidence is inadmissible in a criminal proceeding "[w]hen police officers use an illegal arrest as an investigatory device in a criminal case for the purpose of obtaining fingerprints without a warrant or probable cause." (quotation omitted).  The court further quoted *Olivares-Rangel* for the proposition that "when fingerprints are 'administratively taken . . . for the purpose of simply ascertaining the identity' or immigration status of the person arrested, they are 'sufficiently unrelated to the unlawful arrest that they are not suppressible.'"  *Id*. at 231 (ellipses in original).

In *Oscar-Torres,* the Fourth Circuit deviated from the Tenth in that it drew a distinction between the exploitation of an unlawful arrest for purposes of introducing identity evidence in *civil* deportation proceedings, as opposed to such exploitation for purposes of investigating potential *criminal* immigration violations.  From the principles announced in *Olivares-Rangel*, as well as Supreme Court precedent, the Fourth Circuit concluded:

> This emphasis on the criminal context in which the fingerprints were obtained, and the intended investigative purpose for which they were procured, at least suggests that fingerprints obtained for administrative purposes, and intended for use in an administrative process – like deportation – may escape suppression.
>
> Fingerprinting conducted as part of an arrest intended to lead only to an administrative deportation simply does not present the same concerns as . . . fingerprinting [that leads] to criminal prosecutions . . . .
>
> Accordingly, we adopt the rule articulated by our sister circuits [including the Tenth].  We note that when applying this rule, a court must focus on the "purpose" for the illegal arrest and fingerprinting . . . .  Thus, an alien's fingerprints taken as part of routine booking procedures but intended to provide evidence for a criminal prosecution are still motivated by an investigative, rather than an administrative, purpose.  Such fingerprints are, accordingly, subject to exclusion.

11

*Id*. at 231-32 (citations omitted).

The Fourth Circuit ultimately found it had insufficient evidence to determine whether criminal prosecution or deportation was the primary purpose of the *Oscar-Torres* defendant's arrest; however, it pointed to the following facts that could support a finding that the purpose of the arrest was purely administrative (*i.e.* deportation proceedings): "immigration agents testified that they arrested Oscar-Torres simply to deport him, that they fingerprinted him as part of the 'normal processing for an alien,' and that authorities only contemplated a criminal prosecution" when they discovered he had a prior felony conviction. *Id*. at 232. On remand, the Fourth Circuit instructed as follows: "We recognize that the [district] court may conclude that both investigative and administrative purposes motivated the illegal arrest and fingerprinting, in which case the fingerprint and attendant record evidence must be suppressed." *Id*.

In a case that significantly predates both *Oscar-Torres* and *Olivares-Rangel*, *United States v. Guevara-Martinez*, 262 F.3d 751 (8th Cir. 2001), the Eighth Circuit addressed the question of whether fingerprint evidence was suppressible as fruit of the poisonous tree. There, the defendant was arrested in an illegal traffic stop and officers discovered methamphetamine in his car. *Id*. at 752. Officers transported him to jail where, "[s]uspecting that he might be an illegal alien, [they] informed a special agent of the United States Immigration and Naturalization Service (INS)[2] of the arrest." *Id*. INS determined that he was illegally present in the United

_____

[2] Following the attacks of September 11, 2001, the agency formerly known as INS combined with that known as the United States Customs Service to form the Department of Homeland Security, whose sub-agencies now include the Bureau of Immigration and Customs Enforcement ("ICE"), United States Customs and Border Protection, and United States Citizenship and Immigration Services. Although the INS no longer exists, portions of this opinion refer to it when necessary to expand upon the Eighth Circuit's analysis in *Oscar-Torres*.

States and that he had been previously deported.  *Id*.

As a threshold issue, the Eighth Circuit determined that identity evidence could indeed be suppressed as fruit of the poisonous tree.  *Id*. at 753-54.  Like the Tenth Circuit, the Eighth Circuit distinguished between two types of fingerprint evidence; however, the distinction it drew was somewhat different: fingerprints gathered during "routine booking procedures" versus those gathered "for the purpose of pursuing INS-related proceedings."  *Id*. at 753.  The court held that identity evidence obtained by exploitation of an illegal arrest must be suppressed, "even when the detention is not for the sole purpose of gathering that evidence."  *Id*. at 755.

The court proceeded to evaluate whether the arresting officers in the *Guevara-Martinez* defendant's case obtained his fingerprints through the exploitation of his unlawful arrest.  It concluded that the identity evidence should be suppressed for various reasons: (1) the defendant had not consented to the fingerprinting; (2) the fingerprinting took place *during* the unlawful detention, as opposed to a situation where the arresting officer "merely recommends investigation of a particular individual based on suspicions arising serendipitously from an illegal search" and a separate investigation ensues; and (3) the fingerprinting occurred only after the INS had interviewed the defendant, rather than "as a matter of course through routine booking procedures."  *Id*. at 755-56.

In *United States v. Rodriguez-Martinez*, 2009 WL 2372850 (D. Colo. July 30, 2009) (unpublished), the Colorado district court looked to *Olivares-Rangel* and *Guevara-Martinez* to resolve a motion to suppress identity evidence in an illegal reentry case.  There, the court denied the Government's motion for reconsideration of its previous decision granting the defendant's motion to suppress.  *Id*. at *2-3.  The court declined to conduct a full analysis of the merits of its decision to suppress the fingerprint evidence, as it had done so in the underlying order.

13

Accordingly, this Court has looked to that order for guidance.  *See* Findings of Fact and Conclusions of Law, *United States v. Armando Rodriguez-Martinez*, No. 08-CR-0281-WYD (D. Colo. Feb. 20, 2009) (ECF Doc. No. 31) (hereinafter cited as "Findings & Concl.").

The defendant in *Rodriguez-Martinez* lived next door to another immigrant who ICE was preparing to arrest.  Findings & Concl. at 1-2.  ICE agents erroneously believed that the target might be able to escape through the defendant's apartment, so they knocked on his door, guns drawn, and identified themselves as immigration police.  *Id*. at 3-4, 6 & 9-10.  The defendant confessed his undocumented status and admitted to a prior deportation, and the agents arrested him and obtained his fingerprints.  *Id*. at 6.

The *Rodriguez-Martinez* district court found the defendant's arrest was not supported by probable cause or reasonable suspicion and further found that his confession was fruit of the poisonous tree.  *Id*. at 7 & 13.  The court found that the defendant's fingerprints and A-file were obtained by exploitation of his unlawful detention.  In so concluding, it relied on *Olivares-Rangel* as well as *Guevara-Martinez*.  The court focused on *Guevara-Martinez's* language regarding the purpose of obtaining the suspect's fingerprints: "The absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an INS-related purpose motivated the fingerprinting, . . . counsel in favor of applying the exclusionary rule."  *Id*. at 15 (quoting *Guevara-Martinez*, 262 F.3d at 756).  The court concluded that the fingerprint evidence and A-file must be suppressed because: (1) "an INS related purpose motivated the fingerprinting", and (2) law enforcement officials obtained the defendant's fingerprints during an unlawful detention in order to investigate a criminal immigration law violation.  *Id*. at 15-16.

14

**IV.     Analysis**

At the outset, it is important to acknowledge that the objective of the exclusionary rule is to deter police misconduct.  *See*, *e.g.*, *Hudson v. Michigan*, 547 U.S. 586, 608-09 (2006) (Kennedy, J., concurring in part and concurring in the judgment) ("[T]he driving legal purpose underlying the exclusionary rule [is] the deterrence of unlawful government behavior . . . [and to] compel respect for the constitutional guaranty . . . by removing the incentive to disregard it.").  At the evidentiary hearing, the Government argued that the deterrent function was satisfied in this case: Detective Tafoya conducted an unlawful search, and as a result, his illegal drug arrest will not lead to a criminal prosecution.  According to the Government, Defendant "reaped some benefit [of the exclusionary rule], in the sense that he doesn't face narcotics charges." 2/3/11 Tr. at 69.  However, the Government's argument is incomplete.  The purpose of the exclusionary rule would be equally served in cases where the evidence shows that the arresting officer was in fact motivated by a desire to transport a prisoner to the PTC in order to investigate possible immigration violations.  Although the evidence presented here unequivocally establishes that *all* prisoners are subject to ICE screening at the PTC regardless of their perceived race or national origin, no such evidence was presented with respect to the arrest itself. In other words, given Albuquerque police officers' knowledge of ICE's presence at the PTC, the exclusionary rule should be applied to identity evidence where doing so would serve the purpose of deterring officers from pursuing unlawful arrests based on an arrestee's perceived immigration status.

**A.     "Routine Booking" versus "Exploitation"**

With the exclusionary rule's purpose in mind, the Court turns to the circumstances leading up to and following Defendant's arrest, and endeavors to faithfully apply the legal

15

principles discussed above to the unique facts of this case.  The Court must highlight the

difficulty and novelty this case presents, in that the PTC screening policy at issue in the instant

case does not fall neatly into either of the categories the Tenth Circuit articulated in *Olivares-*

*Rangel*.  The objectives of the policy, by Mayor Berry's own description, go beyond the standard

routine booking procedures contemplated in *Olivares-Rangel*, whose purpose the Tenth Circuit

described as "simply ascertaining or confirming the identity of the person arrested and routinely

determining the criminal history and outstanding warrants of the person arrested."  458 F.3d at

1113.  Indeed, the mayor stated that the purpose of ICE's presence at the PTC was specifically to

screen for immigration violations, which demonstrates that the PTC policy was promulgated for

the specific purpose of identifying the subset of the arrestee population who are also non-

citizens.  However, he further made clear that all arrestees, regardless of their actual or perceived

race or immigration status, would be subject to the same screening process at the PTC.  Whereas

Mayor Berry emphasized his position that immigrants were welcome in Albuquerque, he further

stated that anytime someone is arrested, his or her immigration status is always pertinent.  It is

clear from the mayor's remarks that the policy now in place at the PTC is not consistent with

what the Tenth Circuit described in *Olivares-Rangel* as "routine booking procedures."

　　　　Nor can it be said that the PTC's screening policy by definition amounts to a purposeful

exploitation of an illegal arrest for the objective of obtaining fingerprints.  An immigration

presence in this nation's jails can serve important objectives, and the Court would be unwise to

conclude that in every case in which an arrestee is illegally arrested and then fingerprinted at the

PTC, the illegal arrest is exploited for the purpose of obtaining unauthorized fingerprints and

connecting the arrestee to additional alleged illegal activity.  This Court must accordingly decide

where the PTC screening policy falls on the spectrum between these two extremes – routine

booking versus exploitation of an illegal arrest – articulated by the Tenth Circuit.

From the authority discussed above, the Court has drawn two general conclusions regarding the application of the "fruit of the poisonous tree" doctrine to identity evidence obtained in the PTC's screening process.  First, the evidence must be suppressed if even part of the purpose of the initial illegal arrest was to obtain the arrestee's fingerprints in the hopes of further connecting him to illegal activity.  Second, the identity evidence in any given case must be suppressed if the staff at PTC purposefully exploited an unlawful arrest in order to obtain the arrestee's fingerprints.  Because Defendant here has met his burden of establishing the illegality of the search of his vehicle, the Government bears the burden of proving that the identity evidence in question "was so attenuated from the illegality as to dissipate the taint of the unlawful conduct."  *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000).  In other words, it is the Government's burden to prove: (1) that the initial arrest and search were not conducted in part for the purpose of obtaining evidence of Defendant's identity to establish his unlawful presence in the United States; and (2) that the staff at PTC did not exploit Defendant's arrest for the purpose of obtaining his fingerprints.

### B.    Tension between Fourth, Eighth, and Tenth Circuit Authority

Of course, this Court is bound by the law as interpreted by the Tenth Circuit, and to the extent the Fourth and Eighth Circuit's cases are inconsistent with *Olivares-Rangel*, the Court must not follow those decisions.  In this regard, the Court notes one particular problem with the Fourth Circuit's decision in *Oscar-Torres*.  In that case, the court drew a distinction between the exploitation of an unlawful arrest for purposes of introducing identity evidence in *civil* deportation proceedings, as opposed to such exploitation for purposes of investigating potential *criminal* immigration violations, a distinction for which *Olivares-Rangel* offers no support.  The

17

*Oscar-Torres* court held that when fingerprints are taken for the purpose of "'ascertaining the identity' or immigration status of the person arrested, they are 'sufficiently unrelated to the unlawful arrest that they are not suppressible.'"  507 F.3d at 231 (quoting *Olivares-Rangel*, 458 F.3d at 1112-13).  In contrast, *Olivares-Rangel* draws no distinction between the investigation of civil and criminal immigration violations; rather, it refers broadly to the exploitation of an arrest for the purpose of investigating "additional alleged illegal activity." 458 F.3d at 1116.[3]  Indeed, it is noteworthy that the court directly quoted *Olivares-Rangel* in support of its holding, yet did not include in the quotation marks that portion of the holding specifically regarding immigration status.  *See* 507 F.3d at 231. ("when fingerprints are 'administratively taken . . . for the purpose of simply ascertaining . . . the identity' or immigration status of the person arrested, they are 'sufficiently unrelated to the unlawful arrest that they are not suppressible.'").

        In significant tension with the Fourth Circuit's extension of *Olivares-Rangel*, the Eighth Circuit draws a distinction between fingerprints "obtained as a matter of course through routine booking procedures" and those obtained "for the purpose of assisting [an] INS investigation." *Guevara-Martinez*, 262 F.3d at 756.  The *Guevara-Martinez* court concluded that the defendant's fingerprints should be suppressed in part because of "[t]he absence of evidence that the fingerprinting resulted from routine booking, and the concomitant inference that an INS-related purpose motivated the fingerprinting."  *Id*.  Although the Fourth Circuit cited *Guevara-Martinez* twice in its opinion in *Oscar-Torres*, it did not address the Eighth Circuit's distinction between routine booking and immigration-related investigations.

_____

        [3] The opinion alternatively refers to "illegal activity" and "criminal activity," but the precise holding refers to "illegal activity."

The Colorado district court took guidance from both *Olivares-Rangel* and *Guevara-Martinez*, but did not draw upon or in any way distinguish *Oscar-Torres*. *See generally Rodriguez-Martinez*, Findings & Concl. The court focused on the Eighth Circuit's emphasis on fingerprinting motivated by "an INS-related purpose," *see id*. at 15 (quoting *Guevara-Martinez*, 262 F.3d at 756), and ultimately concluded that such a purpose was dispositive in that case.[4]

### C.  When "Routine Booking" Involves an "INS-Related Purpose"

This Court has carefully examined the rationales offered by both the Fourth and Eighth Circuits in support of their respective conclusions regarding the application of the "fruit of the poisonous tree" doctrine to identity evidence. It appears from *Oscar-Torres* that the Fourth Circuit arrived at its conclusion in part because the Supreme Court has established a general rule that the exclusionary rule simply does not apply in civil proceedings. *See* 507 F.3d at 229-30 (citing *Lopez-Mendoza*, 468 U.S. at 1042-47). The court further relied upon the Supreme Court cases of *Hayes v. Florida*, 470 U.S. 811 (1985) and *Davis v. Mississippi*, 394 U.S. 721 (1969), where "police suspected [the defendants] of criminal activity, and [illegally] detained and fingerprinted them for the clear investigatory purpose of connecting them to specific crimes," *Oscar-Torres*, 507 F.3d at 231; from the Supreme Court's central focus on the *criminal* nature of the investigations, the Eighth Circuit concluded that "[f]ingerprinting conducted as part of an arrest intended to lead only to an administrative deportation simply does not present the same concerns as the fingerprinting at issue in *Hayes* and *Davis*, which was meant to (and did in fact)

---

[4] The district court's complete holding was that the defendant's identity evidence was suppressible due to the INS-related purpose behind the fingerprinting as well as the fact that the fingerprints were obtained through exploitation of the defendant's unlawful detention. However, the wording of the opinion strongly suggests that the INS-related purpose would have been an adequate basis for suppression: "I find that an INS related purpose motivated the fingerprinting, and as such, the exclusionary rule should apply." Findings & Concl. at 15.

lead to criminal prosecutions."  *Id.*

The circumstances surrounding the instant case caution against a hard-line rule allowing the remedy of suppression in a criminal proceeding only when the motivation for taking the fingerprints was for the purpose of pursuing said criminal proceeding, as opposed to civil deportation proceedings.  The PTC screening policy embodies a recent trend of blurring the line between the "purely civil" nature of immigration proceedings and the distinctly punitive nature of criminal punishment.  *Compare I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1037 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry") *with Padilla v. Kentucky*, 130 S. Ct. 1473, 1480 (2010) ("Changes to our immigration law . . . confirm our view that, as a matter of federal law, deportation is an integral part – indeed, sometimes the most important part – of the penalty that may be imposed on noncitizen defendants" (footnote omitted)).  Mayor Berry himself titled his address "Ending Sanctuary for Criminals."  Doc. 17, Attach. D.  This title, which stems from the label of "sanctuary city" that some placed on Albuquerque prior to Mayor Berry taking office,[5] conveys the mayor's position that a "sanctuary" for immigrants is in fact a sanctuary for criminals.  In fact, the policy to which Mayor Berry referred when he described Albuquerque as a "sanctuary for criminals" is the Albuquerque Police Department's Standard Operating Procedure ("APD SOP") regarding the extent to which officers may question suspects or prisoners about their immigration status.  *See* Sean Olson & Dan McKay, *Mayor's Race Turns*

---

[5] *See*, *e.g.*, Dan McKay, *Sanctuary Policy Change Delayed*, ALBUQUERQUE JOURNAL, Dec. 17, 2009 ("Berry's campaign repeatedly described Albuquerque as a 'sanctuary city' for illegal immigrants . . ."); *see also* KOAT ONLINE, *Albuquerque No Longer a Sanctuary City*, May 14, 2010, *available at* http://www.koat.com/news/23549511/detail.htm.

*Nasty*, ALBUQUERQUE JOURNAL, Sept. 24, 2009 ("What Berry calls a sanctuary city policy

actually is a[n Albuquerque Police Department] policy . . . .  Berry is the only [mayoral]

candidate who says Albuquerque is a sanctuary city.").  The APD SOP provides:

> Officers shall not stop, question, detain or arrest any person solely on the ground that
> they may be undocumented and deportable foreign nationals . . . .  Officers shall not
> inquire about or seek proof of a person's immigration status, **unless the person is
> in custody or is a suspect in a criminal investigation for a non-immigration
> criminal violation and the immigration status of the person or suspect is
> pertinent to the criminal investigation** . . . .  Officers are not required to notify
> federal immigration officials and shall not call federal immigration officials to the
> scene of a stop or investigation, except in the case of suspected human trafficking
> . . . .  Officers do not have the authority to place an "ICE" hold on individuals
> suspected of having violated federal immigration laws.

Albuquerque Police Department, Procedural Orders at 2-14 (effective 8/6/07) (emphasis in

original).  As is evident from the APD SOP, the policy to which Mayor Berry referred as a

"sanctuary" policy never placed any restrictions on ICE's presence in Albuquerque jails nor its

capacity to question prisoners in custody regarding their immigration status.  Rather, it limited

the ability of Albuquerque police officers to investigate suspected immigration violations except

in cases where this information was relevant to their criminal investigation.

It is clear from Mayor Berry's address, and the evidentiary hearing testimony, that the

new screening policy at the PTC is in place to identify immigrants for the dual purpose of

pursuing civil deportation proceedings *and* criminal immigration proceedings wherever possible.

An immigrant without legal status, and with no claim to legal status, is always deportable,

whereas criminal proceedings may only be pursued against those found illegally crossing the

border or those found in the United States after having previously been deported.  *See* 8 U.S.C.

§§ 1227, 1325 & 1326.  The PTC screening policy aims to identify those arrestees who are

"violating federal laws," including those who have "[c]ommitted an immigration crime."  2/3/11

Tr. at 42 (testimony of ICE Agent Nancy Rogers).  This demonstrates that, even under the law in

the Fourth Circuit, the dual purpose of the PTC policy may require the suppression of identity

evidence.  *See Oscar-Torres*, 507 F.3d at 232 ("[If the district court concludes] that both

investigative and administrative purposes motivated the illegal arrest and fingerprinting , . . . the

fingerprint and attendant record evidence must be suppressed.").

        For these reasons, the Court finds that the Fourth Circuit's extension of the Tenth

Circuit's holding is incompatible with the true import of *Olivares-Rangel*.  The Court declines to

conclude that identity evidence is never suppressible when its purpose was to "ascertain[] the

identity or immigration status of the person arrested."  *Oscar-Torres*, 507 F.3d at 231.  Instead,

the proper inquiry is whether or not the Government has proven that no part of Defendant's

arrest or subsequent fingerprinting involved an exploitation of his unlawful detention for the

purpose of linking him to any illegal activity, including his suspected unlawful presence in the

United States.

        **D.      The Government Has Failed to Meet its Burden of Proving that the Identity
                  Evidence it Seeks to Introduce Is not "Fruit of the Poisonous Tree"**

        After careful consideration of the principles this Court derives from *Olivares-Rangel* as

well as those consistent principles from the Tenth Circuit's sister circuits, the Court concludes

that the Government has failed to meet its burden.  First, the circumstances surrounding

Defendant's initial arrest are highly suspect.  Upon seeing Defendant's Mexican driver's license,

Detective Tafoya warned Defendant that if he discovered drugs in the car, Defendant would go

straight to jail and *then to immigration*.  This raises an inference that the officer was at least in

part motivated by an immigration-related purpose.  Not only did Agent Rogers testify that

Albuquerque police officers know of ICE's presence in the PTC, but Detective Tafoya's

statement itself demonstrates that he knew ICE would fingerprint Defendant when he arrived at the PTC.  Moreover, two separate prosecuting authorities have concluded that there is simply no question that this arrest amounted to a violation of Defendant's Fourth Amendment rights. Although trained police officers understandably make mistakes regarding the precise contours of Fourth Amendment protections, this case presents a strikingly blatant violation, suggesting that the officer might have been motivated by more than simply the drug evidence he suspected he would find in Defendant's car.  Although the Government argued at the evidentiary hearing that Defendant "was brought into the PTC for purposes of processing his arrest on the state charges of possession of heroin," 2/3/11 Tr. at 68, the Court cannot credit this conclusory statement without hearing testimony from Detective Tafoya.  Given the Government's failure to present any evidence to rebut the inference that Detective Tafoya arrested Defendant in part to aid in the investigation of possible immigration violations, it has not met its burden of disproving that "the illegal arrest [was] in part for the purpose of obtaining unauthorized fingerprints so Defendant could be connected to additional alleged illegal activity."  *Olivares-Rangel*, 458 F.3d at 1116.

Second, the testimony of Agent Rogers confirms the Court's suspicions that the screening policy at the PTC can, in certain cases in which a defendant's initial arrest is unlawful, amount to an exploitation of the arrest.  Throughout her testimony, Agent Rogers referred to her duties as investigative or responded to counsel's questions regarding her "investigation" without questioning this label.  2/3/11 Tr. at 39, 42, 44, 47, 48, 52 & 53.  Given the Fourth and Tenth Circuits' distinction between "investigative" and "administrative" purposes, this testimony is significant.  Also corroborating the investigative nature of ICE's presence at the PTC is Agent Rogers's testimony that her purpose in interviewing prisoners is to determine if they have committed an immigration crime.  While it appears that she may have used the word "crime" to

encompass civil immigration violations as well, this simply demonstrates the heavily criminal

nature of modern day immigration law enforcement.  The most recent United States Sentencing

Commission data show that nearly seventy-seven percent of federal criminal sentencings in New

Mexico are for immigration crimes.  U.S. SENTENCING COMM'N, STATISTICAL INFORMATION

PACKET FISCAL YEAR 2009 DISTRICT OF NEW MEXICO, *available at* http://www.ussc.gov/

Data_and_Statistics/Federal_Sentencing_Statistics/State_District_Circuit/JP2009.htm.  Given

the heavy volume of illegal reentry cases in this District that come directly from ICE's screening

process at the PTC, the Government has not met its burden of proving that neither "investigatory

objectives," *Olivares-Rangel*, 458 F.3d at 1117 nor "an INS-related purpose," *Guevara-*

*Martinez*, 262 F.3d at 756, motivated the fingerprinting.  Even under the Fourth Circuit's more

lenient standard under which fingerprints taken for the purpose of ascertaining one's

immigration status are not suppressible, the Government has not met its burden of showing that

the fingerprinting was not motivated in part by investigative purposes.  *See Oscar-Torres*, 507

F.3d at 232 (evidence must be suppressed if "both investigative and administrative purposes

motivated the illegal arrest and fingerprinting").

Finally, the Court wishes to address the Government's contention that it does not actually

seek to introduce evidence from Agent Rogers's investigation, but rather will only introduce the

Albuquerque Police Department's fingerprint card.  The Court agrees with counsel for

Defendant that "the Government can't whitewash [the process of ICE's investigation] by hiding

behind the city's fingerprint cards."  2/3/11 Tr. at 72.  Defendant was taken into federal custody

on July 20, 2010, yet it was not until after receiving notice of the instant motion in November

that the Government sought out an alternative means to prove Defendant's identity.  *See* 2/3/11

Tr. at 72.  The Court can contemplate no reason other than evasion of the potential illegality of

24

the evidence for the Government to introduce the city's fingerprint card in place of ICE's "sophisticated" electronic evidence.  *Id*. at 46.  Just as the Eighth Circuit concluded in *Guevara-Martinez*, the Government's ability to obtain "a set of untainted fingerprints" does not vitiate the principle that "the most important thing is that those administering the criminal law understand that they must obtain the evidence the right way."  262 F.3d at 756 (quoting *Davis*, 394 U.S. at 726 n.4 (alterations omitted)).  Particularly because ICE's unlawfully obtained fingerprints – and the policy of fingerprinting prisoners for the specific purpose of identifying non-citizens – propelled this prosecution, the Court finds that the Government's ability to find another means of securing evidence of Defendant's identity does not remove the evidence's taint.

## CONCLUSION

The Court concludes that the Government has not met its burden of demonstrating that the evidence of Defendant's identity is sufficiently attenuated from Defendant's unlawful arrest so as to dissipate the taint of the initial illegality.  As the evidence of Defendant's identity amounts to fruit of the poisonous tree, the Fourth Amendment demands that it be suppressed.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Violations of the Fourth Amendment [Doc. 17] shall be **GRANTED**.

Dated this 28th day of March, 2011.

_____
MARTHA VAZQUEZ
U.S. DISTRICT JUDGE

ALBUQUERQUE POLICE DEPARTMENT
* PROCEDURAL ORDERS*

Effective: 08/06/2007; Replaces: 02/13/07, 08/23/04, 03/08/01
07-POR10

2-14-4
cont'd

C.    Undocumented Foreign Nationals (Undocumented Immigrants)

1.    The enforcement of immigration laws and the arrest of undocumented foreign nationals resides exclusively with the federal government.

2.    Officers shall not stop, question, detain or arrest any person solely on the ground that they may be undocumented and deportable foreign nationals.

3.    Officers shall not inquire about or seek proof of a person's immigration status, **unless the person is in custody or is a suspect in a criminal investigation for a non-immigration criminal violation and the immigration status of the person or suspect is pertinent to the criminal investigation.**

4.    Officers are not required to notify federal immigration officials and shall not call federal immigration officials to the scene of a stop or investigation, except in the case of suspected human trafficking.  The following procedures apply to a case of suspected human trafficking:

   a.    Officers shall obtain supervisor approval before contacting federal immigration officials; and

   b.    Officers shall document the investigation in an offense/incident report.

5.    Officers do not have the authority to place an "ICE" hold on individuals suspected of having violated federal immigration laws.

6.    Officers shall not request assistance in language translation from any immigration official or agency.

7.    Officers shall accept the Mexican Consular Identification Card (Matricula Consular de Alta Seguridad) as a valid form of identification.  The Mexican Consular Identification Card is not an indication of a person's immigration status, nor is it sufficient evidence to establish reasonable suspicion of a person's immigration status.

8.    All children have a right to attend public schools in the United States. Officers shall not, under any circumstances, engage in stopping, questioning, detaining, investigating or arresting minor children (under 18 years old) on any immigration-related matter while on or immediately in          the vicinity of public school grounds or property.  Officers are also prohibited from assisting others, including school personnel or other law enforcement officers or agencies, in detaining or questioning minor children on any immigration-related matter.

**ALBUQUERQUE POLICE DEPARTMENT**
**\* PROCEDURAL ORDERS\***

Effective: 08/06/2007; Replaces: 02/13/07, 08/23/04, 03/08/01
07-POR10

2-14-4 C.
cont'd

9.   Nothing in this SOP shall prevent an officer from investigating any city, state or federal non-immigration criminal violation or taking any action necessary for officer safety.

[6]      D.   Arrest of Legal Foreign Nationals (Legal Immigrants)

Whenever a legal foreign national is arrested, officers will:

1.   Immediately advise the foreign national of his right to have his government notified concerning the arrest and/or detention.
2.   The arresting officer will notify the foreign national's consulate of the arrest. (U.S. State Department guidelines)

   a.   The only foreign consulate office in Albuquerque is for Mexico.
   b.   Officers will call the Mexican consulate when dealing with Mexican nationals at 247-4177, or 247-2147.   The office is located at **1610 Fourth Street N.W., 87102**
   c.   If the foreign national is other than Mexican, the officer shall call the Dallas District Office at **202-647-4415**, FAX number **202-736-7559.**

[5]      \*E.   Foreign Diplomats

1.   Foreign Diplomats have diplomatic immunity concerning city ordinances and State and Federal laws under the guidelines of the State Department of the United States.
2.   Foreign diplomats will be dealt with on an individual basis.
3.   They shall not be placed under arrest.
4.   It is the officers responsibility to ensure that the respective foreign consulate has been contacted.  See subsection D 2 above for contact information.

2-14-5      ARREST WARRANTS
[N/A]

A.   In order to serve any warrant, the following information must be provided by the agency requesting service of the warrant:

1.   Physical Description:  The warrant must include a description of the wanted person sufficient to identify the fugitive. The description must include:

   a.   name
   b.   sex
   c.   race
   d.   height & weight